223 F.Supp.2d 650 (2002)
Julian YEBOAH, Plaintiff,
v.
UNITED STATES DEPARTMENT OF JUSTICE, IMMIGRATION AND NATURALIZATION SERVICE, and Kenneth J. ELWOOD, in his capacity as District Director, Immigration and Naturalization Service, Defendants.
No. 01-CV-3337
United States District Court, E.D. Pennsylvania.
June 26, 2002.
*651 Stephen G. Harvey, Pepper, Hamilton and Scheetz, Gerard A. Dever, Fine, Kaplan and Black, RPC, Philadelphia, PA, for Plaintiff.
Linda L. Bocchino, Assistant U.S. Attorney, Seth Weber, U.S. Attorney's Office, Philadelphia, PA, Alison Marie Igoe, Brenda M. O'Malley, U.S. Department of Justice, Office of Immigration Litigation, Washington, DC, Susan R. Becker, United States Attorney, Assistant United States Attorney, Philadelphia, PA, for Defendants.

OPINION AND ORDER
VAN ANTWERPEN, District Judge
Julian Yeboah was ten years old when he arrived alone from Ghana at New York's John F. Kennedy airport on March 4, 2000. He had $1.25 in his pocket, no travel documents, and seemingly, no one to call when he arrived in the United States. The Immigration and Naturalization Service (INS) took Julian into custody upon arrival and he has been in INS custody ever since.
No one but Julian seems certain how or why he came to the United States by himself, and his version is confusing. Julian interviewed with a child psychiatrist, *652 who reported that the boy was running away from his abusive father  Julian's mother had long since abandoned the family. Julian claims that a friend of his father's swept him up and put him on an airplane. Initially, Julian's father reported his son missing. After first saying he wanted Julian to return to Ghana, the father now says he does not want Julian back.
Plaintiff wishes to petition for Special Immigrant Juvenile (SIJ) status under 8 U.S.C. § 1101(a)(27)(J)(i), as amended, which would allow him to remain in the country as an abused, neglected or abandoned child if he were declared dependent on a state juvenile court. Under this provision, the INS retains jurisdiction over Julian and must give its consent for his case to go before a state court for a dependency hearing.
The INS has refused to allow Julian to attend a dependency hearing. The INS found that Julian's account of abuse, neglect and abandonment lacked credibility. The agency believes that Julian's father probably sent him to America in an illfated effort to improve his son's prospects for the future, in the hope that someday Julian's father and brother might come to join him here. The INS points to statements to that effect which Julian's father made to officials in Ghana and which Julian made to the Ghanian Embassy in the United States. Among other evidence, the INS highlights the fact that while in the agency's custody, Julian has maintained regular telephone communication with his father  suggesting that Julian's father has not abandoned him.
When the INS refused Julian's petition to go before a state juvenile court, he sued the agency demanding review of its decision under the Administrative Procedure Act (APA), 5 U.S.C. § 706. Specifically, Plaintiff requested that we declare the decision arbitrary, capricious and an abuse of discretion, in violation of the APA, and that we enjoin the INS to consent to a dependency hearing. The agency argued that we did not have subject matter jurisdiction to review the case under Fed. R.Civ.P. 12(b)(1), but we rejected this notion. Yeboah v. I.N.S., 2001 WL 1319544 (E.D.Pa.2001).
The parties subsequently filed cross motions for summary judgment. After oral argument on March 13, 2002, we remanded the case to the INS District Director for reconsideration in light of additional evidence obtained after his original decision denying Julian consent to go before a state juvenile court. The INS reconsidered, but even with this additional evidence, the agency rejected Julian's petition, and the parties re-filed summary judgment motions.
Because the SIJ provision gives the INS discretion to consent to a dependency hearing, we have no authority to overturn the agency's ruling unless it abused this discretion or issued an arbitrary or capricious decision. We find that Plaintiff has presented no evidence suggesting the INS abused its discretion by failing to consider Julian's case, straying from its own regulations or otherwise denying Julian due process. Moreover, the INS' decision  while not the only decision the agency could have made  was not arbitrary or capricious, based on the facts the agency considered. Accordingly, we must grant summary judgment to the INS and deny summary judgment to Plaintiff. The parties may now proceed on the stipulated final removal order entered by Immigration Judge William Van Wyke in York, Pennsylvania on August 22, 2001, which was not executed by stipulation pending the outcome of this lawsuit.

I. STANDARD OF REVIEW
The standard of review is the most important determining factor in this case. If *653 we were reviewing the case de novo, then we might be free to look at the complete record regarding the possibility of SIJ status for Julian and determine whether we thought he seemed to be abused, neglected or abandoned such that it would not be in his best interest to return to Ghana. However, our authority is not so pervasive.

A. Reviewing the Agency's Decision-Making
Plaintiff challenges the INS' internal policies, regulations and procedures which helped the agency reach its conclusion regarding Julian. The SIJ provision amended by Congress in 1997 merely states that no juvenile court can determine a petitioner's dependency "unless the Attorney General [through the INS] specifically consents to such jurisdiction" 8 U.S.C. 1101(a)(27)(J)(iii)(I). Congress never defined the parameters governing such consent. The INS moved to fill this void with a memorandum labeled "Clarification of Interim Field Guidance" regarding SIJ status, which states, "The [INS] district director, in consultation with the district counsel, should consent to the juvenile court's jurisdiction if: 1) it appears that the juvenile would be eligible for SIJ status if a dependency order is issued; and 2) in the judgment of the district director, the dependency proceeding would be in the best interest of the juvenile." Plaintiff's Complaint, Ex. A, Memorandum for Regional Directors, Subject: Special Immigrant Juveniles, July 9, 1999, p. 2.
Defendant argues that we should defer to the INS' two-pronged reasoning and methodology described in the agency's field guidance, and Plaintiff rebuts that the INS memorandum is not entitled to deference.
In general, when Congress has not directly spoken to the precise question at issue, we may not "simply impose our own construction on the statute." Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); Fatin v. INS, 12 F.3d 1233, 1239 (3rd Cir.1993). "Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id.
Despite the paucity of cases nationwide applying the 1997 amendment to the SIJ provision, one Federal District Court in New Mexico did interpret the statute, holding that the "Interim Field Guidance is not the type of agency decision which warrants Chevron deference." Yu v. Brown, 92 F.Supp.2d 1236, 1243 (D.N.M. 2000).[1] The Yu court noted that the memo incorporated no legal reasoning or statutory construction, but merely set forth its policy cursorily. Id. The court explained,
It is impossible for the Court to determine whether the INS's construction of [the 1997 amendment to the SIJ provision] ... is reasonable without any indication of the reasoning, analysis or rationale underlying the INS's conclusion. *654 Other courts that have had the benefit of reviewing the INS's legal reasoning and analysis underlying its interpretation of a statute, have rejected such interpretations where it found the legal reasoning flawed. [Citations.] In the absence of any legal reasoning, [relevant] analysis or reference to any overriding policy concerns, deference to the Interim Field Guidance is not warranted.
Finally, the Interim Field Guidance is not the type of agency decision which warrants Chevron deference. The Tenth Circuit has made clear that an agency's statutory construction is entitled to Chevron deference only when it is reached through the proper rulemaking procedures pursuant to the Administrative Procedure Act, such as either an administrative rulemaking or an adjudicative decision. [Citations.] Here, the only INS interpretation offered by the Government is an Interim Field Guidance, not arrived at through the proper rulemaking or adjudicative channels, which blankly [sets forth the policy] without any statutory construction or legal analysis explaining this conclusion. Under these circumstances, the Court is not bound to follow this INS interpretation and would even be remiss if it deferred to such an unsupported and unexplained statutory construction. Id. at 1243-1244.
We are inclined to agree with the Yu court's thinking, which suggests that this INS field guidance memo should not carry the force of law, entitled to Chevron deference. Even so, Defendant suggested at oral argument and we concur that the INS field guidance might be entitled to "respect according to its persuasiveness" (also called Skidmore deference)  a standard given new life by the Supreme Court subsequent to the Yu decision. See U.S. v. Mead Corp., 533 U.S. 218, 222, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), citing Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). See also Michael C. ex rel. Stephen C. v. Radnor Tp. School Dist., 202 F.3d 642, 649 (3rd Cir. 2000) ("This court has held that the level of deference to be accorded such interpretive rules depends upon their persuasiveness. Admittedly, they do not rise to the level of a regulation and do not have the effect of law. A court is not required to give effect to an administrative interpretation. Instead, the level of deference given to an interpretive bulletin is governed by the bulletin's persuasiveness." [Internal citations and quotation marks omitted.]).
Yet, even if we agreed with Plaintiff that we need not give any heed to the INS policy (i.e., finding the interpretation unpersuasive) because the INS has no expertise in juvenile placement,[2] we could only overturn the agency's decision exercising our authority under the APA.[3]

*655 B. Reviewing the Agency's Decision
Under § 706(2)(A) of the APA, we may hold unlawful and set aside INS actions, findings and conclusions  like the decision to deny a juvenile a dependency hearing in state court  if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Plaintiff's Summary Judgment Motion ("Pl.SJ"), pp. 3-4; Defendant's Cross Motion for Summary Judgment ("Def.SJ"), p. 8; Gao v. Jenifer, 185 F.3d 548, 556 (6th Cir.1999) ("To be entitled to the grant of his petition, [an SIJ plaintiff] must show that the INS' denial of his petition amounted to an abuse of discretion."). As the Third Circuit explained in a case brought under the APA:
An action will not be deemed arbitrary, capricious, or an abuse of discretion simply because one may happen to think it ill-considered, or to represent the less appealing alternative solution available. We will not substitute our judgment for that of the agency. Rather, we require that the agency's action be rationally related to the purposes to be served, and supported by the facts found in the record. (Internal citations and quotation marks omitted.) Hondros v. U.S. Civil Service Com'n, 720 F.2d 278, 295-296 (3rd Cir.1983).
This is not to say that an alien in Julian's position has no rights against the INS. Extending into the SIJ context the reasoning of the Third Circuit's immigration decision in Blazina v. Bouchard, 286 F.2d 507, 511 (3rd Cir.1961), cert. denied, 366 U.S. 950, 81 S.Ct. 1904, 6 L.Ed.2d 1242, Julian has the right to have his request for a dependency hearing considered. "Such consideration must be given in conformity with the pertinent regulations promulgated by the Attorney General himself. Procedural due process must be afforded the applicant at all times." (Internal citations omitted.) Id. See also Gao, 185 F.3d at 557 (departure from INS policies is abuse of discretion).
Thus, relying on Hondros and Blazina, our review must determine whether the INS reasonably based its conclusions on facts in the record after giving Plaintiff a full and fair opportunity to plead his case administratively.

II. THE I.N.S. DECISION
We all admire the values epitomized by Emma Lazarus' poem, "The New Colossus," on the Statue of Liberty, as we consider immigration cases. She says, "Give me your tired, your poor, Your huddled masses yearning to breathe free, The wretched refuse of your teeming shore. Send these, the homeless, tempest-tossed to me, I lift my lamp beside the golden door!"
Yet, Americans have long believed that the promise of America to these "huddled masses," from which most of us once came, can only be secured by placing some restrictions on immigration  without which our nation's seams would surely burst. One of many immigration policy reports by America's elected representatives observed,
With increasing civil unrest, poor economic conditions and natural disasters throughout the world, more and more people look to this country as a safe haven. Faced with growing demands for admission to this country, Congress has wrestled with the issues of who and how many should be allowed to enter *656 and under what circumstances. It has struggled with how to prevent the illegal entry of aliens who do not meet the criteria for admission but who desperately seek a better life. ... H.R. Rep. 103-216 "The Immigration and Naturalization Service: Overwhelmed and Unprepared for the Future," August 4, 1993.

A. Arbitrary and Capricious
In the INS' view, Julian's father desperately sought a better life for his son. Though Ghana has been far more politically stable than many of its West African neighbors, the United States' per capita Gross National Income is still approximately 100 times that of Julian's home country.[4] Notwithstanding Julian's account of being surreptitiously escorted to the airport by an anonymous friend of his father, the INS believes that Julian's father sent his son to America. The agency bases this conclusion on its discussion with a Ghanian Embassy Minister who interviewed Julian, reporting that Julian's father drove him to the airport and handed his documents to an airlines official. Def. SJ, Ex. M, Minister Afrifa-Kyei Interview. Though Plaintiff contends he has no family in America and came without knowing where he would stay, the Minister indicated that Julian was visiting an aunt in New York City. Id. Indeed, the Embassy first learned of Julian's presence in America immediately after his arrival when, believing that Julian did not arrive, an anonymous woman called the Ghanian Embassy concerned (probably Julian's aunt, the Embassy speculates). Id.
Moreover, the INS' office in Ghana interviewed Julian's father and he told them stories which contradicted those he had told Julian's school principal and the local police. Id., Ex. L, INS Ghana Memo, p. 2. The Ghanian INS officer concluded that Julian's father "filed a missing child report to the [Ghanian] police after he learnt that attempts to smuggle the child into the United States had failed." Id. The Ghanian INS officer concluded that Julian's father was likely sending Julian to stay with his sister, whose address in the United States (if she in fact lives here) remains unknown. Id.
Another internal INS message sent to Washington D.C. by the Ghanian INS official is perhaps even more revealing. He reported:
We have learnt from contacts here that the father's intent is for [the United States government] to admit him [as] an immigrant so that he would take care of the child in the United States. Otherwise, he will continue creating all kinds of excuses to make it difficult for INS to return the child back to Ghana. It may sound silly, but that seems to be the child's family plan. I believe that the father is also being coached by so called immigration experts. Rumors have spread out in some circles of the Ghanian community here that Julian will be allowed to stay in the United States under the custody of the [United States government] until he turns 18. When Julian turns 18, he would be given a choice either to return to his homeland or become a U.S. citizen. He will choose the [latter] and then file a petition for his father and the rest of his family. Id., Ex. F., Hailu Kebede Email.
The concept of reunifying the family in the United States was further edified by *657 Julian's comment to an INS investigator, after the former spoke to his father, that, "I can stay here and my dad is going to come and visit me." Id., Ex. G, Terrell Memo, p. 2.
The SIJ provision specifically prohibits ever giving immigration rights or privileges to the parents of a child accorded SIJ status. 8 U.S.C. 1101(a)(27)(J)(iii)(II). However, we can imagine how misinformation might have led Julian's father to believe that Julian would become a citizen and send for his family.
We agree with Plaintiff's Response to Defendants' Cross Motion for Summary Judgment ("Pl.Resp.") that Julian did not travel to the United States in the hopes of obtaining SIJ status here. Pl. Resp., p. 6. It strains credulity to think that the ten-year old knew of this provision and how to take advantage of it, when our American courts are still trying to understand its meaning. On the other hand, we think it entirely plausible that Julian came to America generally seeking a better life, as so many others have done before him.
Plaintiff's primary evidence in response consists of a report by a highly-qualified child psychiatrist, Dr. Marc Forman, opining that Julian should not be returned to Ghana because he would be subjected to continued beatings by his father with a belt or tree branch. Pl. Complaint, Ex. B., Dr. Forman Report, p. 3-5. Julian claimed that a finger or an arm was once broken. Id. at 3. Dr. Forman diagnosed Julian with Posttraumatic Stress Disorder resulting from physical abuse, resulting in stuttering, nervous tics of the eyes, anxiety and sleep disturbance, bed wetting and depression. Id. at 5. The doctor worried that Julian could develop "serious mental illness" if he were subjected to continued abuse by his father. Id. The doctor concluded that Julian should be transferred to a foster family in America as soon as possible. Id.
Responding to Plaintiff's allegation of physical abuse justifying SIJ status, the INS presents medical records (including radiological testing) indicating that Julian had no history of serious injuries or fractures, as the boy suggested, and that he did not mention any physical abuse in his medical examinations.[5] Def. SJ, Exs. A, D, E, Medical Records. The INS also noted that the staff of the facility in which Julian was detained observed none of the depression or dysfunctional behaviors reported by Dr. Forman. Def. SJ, p. 10. On the contrary, the staff found Julian to be active, social and generally happy. Id.
Finally, and we believe most persuasively, the INS presents evidence tending to refute the idea that Julian's father abandoned or neglected him. Though Julian's father more recently signed a statement indicating that he no longer wished his son to return to Ghana, suggesting abandonment, we observe that after Julian arrived in the United States, his father told an INS investigator, "If he is safe in the United States, then he can stay. I want to talk to the boy before I say anything." Def. SJ, Ex. C, Quintanar Interview. When Julian's father spoke by phone with his son in February 2001 while Julian was in the presence of INS officials, the father asked if Julian was in school in the United States. Def. SJ, Ex. G, Terrell Memo. Upon receiving an affirmative response, Julian's father stated, "It would be okay if he stayed [in the United States] then." *658 Id. At the end of the call, Julian and his father set up regular times to speak and Julian was overheard ending the phone call by saying, "I love you too, Dad." Id. Thereafter, Julian began regularly speaking to his father in Ghana  14 times from February to September, 2001. Id., Ex. G, Telephone Log for Julian Yeboah.
The very thought that Julian's father wanted the best for his son and remained in regular communication with him undermines the child's chance of meeting our admission criteria under the SIJ provision. The image of a concerned father does not comport with the image of an abusive, neglectful father who abandons his son.[6]
Thus, we cannot say that Defendant arbitrarily and capriciously denied Julian consent to go before a state juvenile court for the purpose of being declared a dependent such that he might apply for SIJ status. The INS' evidence could reasonably lead to the conclusion that Julian was not abused, neglected or abandoned such that he would be eligible for the special status, and that in fact, Julian was hoping to utilize the SIJ opportunity to immigrate with his family.
We reiterate that if we analyzed the case upon de novo review, we might well reach a different result. Dr. Forman's report provides credible evidence of abuse, neglect and abandonment which would raise a triable issue of fact as to Julian's qualification for SIJ status. But the arbitrary and capricious standard we apply to the agency's decision under the APA is vastly different from the common standard of review upon summary judgment  which permits summary judgment only if there is no genuine issue as to any material fact, resolving all doubts in favor of the non-moving party. Fed.R.Civ.P. 56(c); United States v. Diebold, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Here, despite the genuine issues, we must resolve our doubts in favor of the agency, because it relied upon credible information in the record when making its determination.

B. Abuse of Discretion
The SIJ provision clearly states that the INS must consent before juveniles in agency custody are allowed to go before a state court for a dependency hearing. 8 U.S.C. 1101(a)(27)(J)(iii)(I). Logic dictates, then, that the INS may sometimes deny such consent, exercising its discretion. We have called into question, supra at I.A, the weight of the INS' internal guidance as to how the agency must determine whether or not to grant such consent. Yet, the agency was charged with making decisions, which it was required to do in the spirit Congress intended when it gave the Attorney General this power by amending the SIJ provision in 1997. In the instant case, we cannot say the INS *659 abused its discretion if the Attorney General acted through the INS in accordance with the legislative intent, and if Plaintiff was afforded procedural due process during the course of the INS' decision-making. If we find no abuse of discretion, the agency's decision must stand.

1. Legislative Intent
We find no contemporaneous elaboration of Congress' purpose when it enacted the original SIJ provision in 1990. See Yu, 92 F.Supp.2d at 1246 (likewise finding no evidence of the original legislative intent). However, two documents suggest Congress' reasoning when it amended the provision in 1997. The House Conference Report discussing the amendment states that it was meant to address "several problems encountered in the implementation of the special immigrant juvenile provision." Conference Report on H.R. 2267, Sec. 113, Congressional Record, House of Representatives, 143 Cong. Rec. H10809-01 (November 13, 1997). The Report explains:
The language has been modified in order to limit the beneficiaries of this provision to those juveniles for whom it was created, namely abandoned, neglected, or abused children, by requiring the Attorney General to determine that neither the dependency order nor the administrative or judicial determination of the alien's best interest was sought primarily for the purpose of obtaining the status of an alien lawfully admitted for permanent residence, rather than for the purpose of obtaining relief from abuse or neglect. The conferees intend that the involvement of the Attorney General is for the purposes of determining special immigrant juvenile status and not for making determinations of dependency status. In addition, in order to preclude State juvenile courts from issuing dependency orders for juveniles in actual or constructive custody of the INS, the modified provision removes jurisdiction from juvenile courts to consider the custody status or placement of such aliens unless the Attorney General specifically consents to such jurisdiction. Id.

We believe based upon this report that the INS must enforce the SIJ provision as amended with a keen eye toward preventing misuse of the status by those merely hoping to obtain residency, as opposed to relief from abuse, neglect or abandonment. Moreover, the amended SIJ provision divests state juvenile courts of jurisdiction over such matters, unless in a given case the INS explicitly concedes such jurisdiction so the appropriate state court may hold a dependency hearing. See accord Gao, 185 F.3d at 556.
The second bit of legislative history on the 1997 amendment consists of a conversation on March 12, 1997 between the amendment's sponsor, Senator Pete Domenici of New Mexico, and then Attorney General Janet Reno, during a hearing of the Appropriations Subcommittee on Commerce, Justice, State, and Judiciary and Related Agencies on the Fiscal Year 1998 Budget Request of the Justice Department. The Senator recounted various instances in which SIJ status had been granted. The first case, which represented "the type of case that the [SIJ] status was designed to protect," involved a small child brought illegally into the U.S. by her parents. They sexually and physically abused her and she was eventually taken into the protective custody of New Mexico's Health and Human Services Department. Though the parents were denied residency, the child (then 11 years old) was accorded SIJ status, placed in foster care, eventually adopted and allowed to remain in the U.S.
The other cases the Senator cited, suggesting the reason for the amendment, involved foreign-born, approximately 18-20 *660 year-old university students in the U.S. Their American sponsors approached the state courts petitioning for permanent guardianship  which the state courts granted, conferring SIJ status upon the students, though they were neither abused, neglected or abandoned. The Senator asserted, "When the lawyers find this, every visiting student from overseas can have a petition filed in a state court, and [declare] that they're [sic] a ward and in need of foster care." The Senator and Attorney General crafted the 1997 amendment to the SIJ provision to remedy this "giant loophole." See also Yu, 92 F.Supp.2d at 1245 (remarking that the Domenici-Reno discussion "again makes clear the purpose of the Amendment was to limit SIJ eligibility"). Julian's case does not tend toward either extreme  the clearly physically, sexually abused child or the opportunistic college student. Nonetheless, we can conclude based on the Conference Report and the discussion among the amendment's sponsors that Congress wished the INS to exercise controls in such cases to sort the genuine claims of abuse, neglect and abandonment from those asserted merely to obtain residency. Regardless of the assessment criteria the INS used in this case, it does appear that the agency's inquiries were directed to the appropriate question  namely, whether Julian was abused, neglected or abandoned or merely trying to obtain residency. The agency found the evidence suggested the latter (that Julian and his father were colluding to gain immigration privileges) more than the former.

2. Procedural Due Process
As we noted in Section I.B, supra, citing Blazina, inter alia, Julian's request to go before a juvenile court was entitled to consideration according to internal INS regulations and principles of procedural due process. The INS issued an internal guidance memorandum as to how to process such requests, but enacted no regulations outlining the criteria for their consent to a dependency hearing under the SIJ provision.
Nonetheless, we find in the case at bar that the INS has adequately grounded their consent determination in fact and in accordance with the spirit of the amended SIJ provision. Plaintiff argues that Dr. Forman's report was neither given proper heed by the agency nor rebutted with the opinion of any other expert. But Plaintiff cites no INS regulation or other law which requires the agency to rebut experts with experts. In this case, Dr. Forman's conclusions were countered by agency officials in Ghana, a Minister of the Ghanian Embassy and personnel in daily contact with Julian in America, among others. We believe that the INS was entitled to rely upon such information in making its determination.
Plaintiff was given ample opportunity to argue his case to the INS District Director, who considered all evidence presented in making his rulings. We heard Plaintiff's case at oral argument. Then, at our behest, the District Director reconsidered all of Plaintiff's evidence and issued another decision, albeit with the same final result. Plaintiff was fortunate to be represented by extremely competent counsel at all stages of the administrative proceedings. Thus, we cannot say Plaintiff was denied procedural due process.

CONCLUSION
We find that the INS' decision not to allow Plaintiff to go before a state juvenile court was adequately predicated on facts in the record, and made in a manner consistent with the legislative intent behind the SIJ provision, after giving Plaintiff a full and fair opportunity to be heard. Thus, we find that the Defendant did not act arbitrarily or capriciously or abuse its *661 discretion in violation of the APA, and we will grant Defendant's summary judgment motion and deny Plaintiff's.
The parties may now proceed on the stipulated final removal order.
An order consistent with this opinion follows.

ORDER
AND NOW, this 26th day of June, 2002, consistent with the foregoing opinion, it is hereby ORDERED that Plaintiff's Motion for Summary Judgment, filed May 17, 2002, is DENIED, and Defendant's Cross Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, filed June 4, 2002, is GRANTED.
This case is DISMISSED and judgment will be entered.
Franklin S. Van Antwerpen, U.S.D.J.
NOTES
[1] The INS memorandum before us is a different memorandum from that considered by the Yu court  in fact, it is a "clarification" of the Interim Field Guidance which the Yu court held was not entitled to deference. The guidance before us states, "The clarification that is provided in this memorandum supercedes the previous guidance on these subjects," including the memo discussed in Yu. Nonetheless, the authority of the memo relevant in this case is identical to that of the memo in Yu, in that it was not developed through proper rulemaking procedures. Thus, Yu's rulings as to its entitlement to deference  or lack thereof, as the case may be  are directly on point. Like the memo in Yu, the memo in this case sets forth the two-pronged reasoning applying the statute but provides no legal analysis or other justification for its approach.
[2] There is some support for this position. It is clear that deference will only apply to an inquiry that implicates agency expertise in a meaningful way. See Francis v. Reno, 269 F.3d 162, 168 (3rd Cir.2001). The INS' second prong inquiry as to "best interest of the child" may not comport with the INS' own rule, 53 FR 17449, stating that the INS "has neither the expertise nor the resources to conduct home studies for placement of each juvenile released." The Supreme Court, Justice Scalia affirmed this rule in Reno v. Flores, 507 U.S. 292, 310, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993), noting that the States "possess `special proficiency' in the field of domestic relations, including child custody."
[3] Here, we need not rule on the INS' two-pronged approach because the agency's decision stands in any event (see infra), since Plaintiff was not deprived of procedural due process and the agency's final conclusion was permissible based on the law and the facts.

We note that the INS' approach to this SIJ question  and its lack of expertise in family and children's issues  may soon become moot under S2444, a bill introduced by a host of United States Senators from both major political parties on May 2, 2002 proposing to amend the Immigration and Nationality Act. Part of the bill, called the Unaccompanied Alien Child Protection Act of 2002 (Title III of S.2444), establishes a new Office of Children's Services which would handle juveniles like Julian without INS intervention. Section 341 of the bill significantly amends 8 U.S.C. 1101(a)(27)(J), changing the process by which someone applies for SIJ status.
[4] The World Bank, International Monetary Fund and African Development Foundation all estimate that Ghana's GNI per capita (a measure of the income generated to each person based on the country's productivity) is well under $400 a year (probably under $350), while the United States' per capita GNI was over $34,000 as of the year 2000.
[5] Plaintiff notes, however, that Defendants present no evidence that "Julian was asked any questions about how he had been treated by his father." Pl. Resp., p. 3. This argument certainly reduces the impact of the boy's failure to mention parental abuse, but we still find damaging to Julian's credibility the fact that his claim of having broken a bone was not substantiated.
[6] Plaintiff suggests that the father's neglect or abandonment is evinced by the fact that Julian did not speak with his father for many months after he first arrived in the U.S. Julian states that he did not remember his father's phone number and no officials in Ghana could locate him. We find more important the fact that after Julian had his father's contact information, the two remained in regular communication.

Plaintiff also says that the very fact that young Julian was put on an airplane with virtually no money or plans following his arrival in the U.S. "is a form of child abuse." Pl. SJ at 6. While this action certainly does not appear to suggest responsible parenting, we cannot conclude that Julian's mere arrival is irrefutable evidence of child abuse. Such a conclusion would fly in the face of Defendant's evidence suggesting that Julian's journey was part of a family immigration strategy  albeit an ill-conceived one- and that Julian's father remained concerned for his son's welfare (e.g., inquiring whether his son was safe and in school, speaking regularly to him) following Julian's arrival in the U.S.