**Julian YEBOAH, Appellant**

v.

**UNITED STATES DEPARTMENT OF JUSTICE Immigration and Naturalization Service; Charles W. Zemski, District Director, United States Department of Justice, Immigration and Naturalization Service; Kenneth J. Elwood.**

No. 02–2921.

United States Court of Appeals, Third Circuit.

Argued Oct. 18, 2002.

Filed Sept. 29, 2003.

Stephen G. Harvey, (Argued), Pepper, Hamilton, L.L.P., Philadelphia, Gerard A. Dever, Fine, Kaplan and Black, R.P.C., Philadelphia, PA, for Appellant.

Robert D. McCallum, Jr., Assistant Attorney General, Terri J. Scadron, Senior Litigation Counsel, Brenda M. O'Malley (Argued), Attorney, Office of Immigration Litigation, U.S. Department of Justice, Civil Division, Washington, DC, for Appellees.

Before ROTH, GREENBERG, Circuit Judges and WARD * District Judge.

## OPINION OF THE COURT

ROTH, Circuit Judge.

We address two issues in this appeal. First, did the District Court have subject matter jurisdiction to review the denial of Julian Yeboah's request for consent to a dependency hearing for special immigrant juvenile (SIJ) status. Second, if it did have jurisdiction, was the Attorney

---

* Honorable Robert J. Ward, District Court Judge for the Southern District of New York, sitting by designation. Judge Ward partici- pated in the argument and conference in this appeal but died before the opinion was filed.

General's denial of consent for a hearing arbitrary and capricious or an abuse of discretion under the Immigration and Naturalization Act, 8 U.S.C. § 1101, *et seq.* as amended (INA). We hold, in light of our decision in *M.B. v. Quarantillo*, 301 F.3d 109 (3d Cir.2002), that the District Court did have jurisdiction. In addition, we conclude that the Attorney General did not abuse his discretion or act arbitrarily or capriciously in denying Julian's request. Accordingly, we will affirm the grant of summary judgment to the Immigration and Naturalization Service (INS) by the District Court.

## I. Facts

Julian (Kofi) Yeboah seeks SIJ status pursuant to 8 U.S.C. § 1101(a)(27)(J) (2002), which allows an alien juvenile to remain in the United States in long-term foster care if a state juvenile court declares the juvenile dependent due to abuse, neglect, or abandonment. Julian arrived at John F. Kennedy Airport in New York from the Republic of Ghana on March 4, 2000. He was 10 years old and unaccompanied, with no travel documents and only $1.25 in his pocket. Upon arrival in the United States, the INS took Julian into custody, where he remains. Julian's father and brother are in Ghana. His mother abandoned the family when Julian was a small child. The remaining facts are not clear. Julian alleges that a friend of his father placed him on the airplane to come to the United States. However, a Minister from the Ghanaian Embassy, who interviewed Julian, testified that Julian's father, Thomas Yeboah, placed Julian on the plane. Julian claims that he has no family in the United States, but an anonymous woman, believed to be Julian's aunt, telephoned the Ghanaian Embassy after Julian's arrival, fearful that he had not arrived. Julian states that he was abused and abandoned, but the medical reports, read together, are inconclusive.

The parties dispute the nature of Julian's relationship with his father. Dr. Marc A. Forman, a child psychologist, conducted a 90 minute interview with Julian. In his written report, prepared on Julian's behalf, Dr. Forman notes that Julian stated he came to the United States to escape his abusive father. In view of Julian's stuttering, nervous ticks in both eyes, bed wetting, depressed affect, and anxiety and sleep disturbance, Dr. Forman diagnosed Julian with Posttraumatic Stress Disorder stemming from physical abuse and "being sent out of the country . . . as an unaccompanied minor." Dr. Forman believed that Julian risked developing a "serious mental illness" if he were forced to return to Ghana and recommended that Julian remain in the United States in foster care. The report documented that Julian "thought his father had broken one of his fingers, or maybe his arm, but he couldn't remember which side."

The INS, however, concluded that Julian was not abused, based upon a separate medical examination at which Julian apparently was not asked about, and failed to mention, accidents or injuries during the previous year. X-rays and a CAT scan revealed no physical signs of past abuse. In addition, the INS District Director presented the comments of the staff at Berks County Youth Center that Julian did not exhibit depression or dysfunctional behaviors and was social, active, and "relatively happy." The INS did not offer the testimony of a competing child psychologist.

The INS believes that Julian's father placed him on the airplane in an attempt to secure United States citizenship for the boy, possibly as part of an unworkable long-term scheme to make the father and brother eligible for United States citizen-

ship.[1] Julian's father originally told the INS that he wanted his son to return to Ghana. After Julian's first request for an SIJ hearing was denied, the father sent a declaration that he does not want Julian to come back. Julian has been in telephone contact with his father on 15 occasions between February and September 2001 and twice between December 2001 and January 2002.

The INS District Director, acting on behalf of the United States Attorney General, denied consent to an SIJ proceeding. Julian brought suit against the INS under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* (APA) in the District Court for the Eastern District of Pennsylvania, arguing that the District Director's decision was arbitrary and capricious or an abuse of discretion. The government moved to dismiss the action under Fed. R. Civ. Pro. 12(b)(1), on the ground that the District Court lacked subject matter jurisdiction to review the decision of the Attorney General. The District Court held that the decision of the Attorney General was subject to judicial review and denied the government's motion to dismiss. *Yeboah v. INS*, No. 01–CV–3337, 2001 WL 1319544, at *1, 4, 2001 U.S. Dist. LEXIS 17360 *1, 17 (E.D.Pa. Oct.26, 2001).

Both parties moved for Summary Judgment. The District Court remanded the matter to the INS District Director for reconsideration in light of the newly received declaration by Julian's father that he did not want Julian to return to Ghana. The INS again rejected Julian's petition on the basis that Julian was seeking SIJ status for the improper purpose of obtaining permanent resident status, rather than seeking relief from abuse, abandonment, or neglect. The District Director concluded:

> Julian has failed to establish that he suffered abuse, abandonment, or neglect in Ghana. Thus, the Service has concluded that Julian is not seeking SIJ status for the purpose of obtaining relief from abuse, abandonment and neglect, but rather is seeking that status for the purpose of obtaining permanent residence.

The parties refiled cross-motions for Summary Judgment. The District Court granted Summary Judgement in favor of the INS and ordered the parties to proceed with the stipulated final removal order. *Yeboah v. INS*, 223 F.Supp.2d 650 (E.D.Pa.2002). Julian now appeals the grant of summary judgment by the District Court.

## II. Jurisdiction and Standard of Review

■ The jurisdictional issue in this case is resolved by *M.B. v. Quarantillo*, 301 F.3d 109 (3d Cir.2002), in which a panel of this Court held that under the APA, 5 U.S.C. §§ 701–06, federal courts have jurisdiction to review the Attorney General's denial of an alien's request for consent to a state juvenile dependency hearing. The facts of *M.B.* parallel those of the present case: a plaintiff alien requested a state juvenile dependency hearing for purposes of determining whether the alien qualified for SIJ status.[2] Thus, pursuant to *M.B.*, the District Court had subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the APA.

---

1. The parents of children granted SIJ status are not eligible for immigration rights and privileges. 8 U.S.C. § 1101(a)(27)(J)(iii)(II); *see also* H.R.Rep. No. 105–405 at 130.

2. The Court notes that the plaintiff in *M.B.* was ineligible for SIJ status since he was past the age of majority, but this distinction does not alter the applicability of the jurisdictional review holding.

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, as the District Court's order of June 26, 2002, is a final, appealable order.

 Although this case is an appeal from the denial of a Fed. R. Civ. Pro. 56(c) cross-motion for Summary Judgement, our standard of review of the INS District Director's decision under the APA is limited to abuse of discretion. 5 U.S.C. § 706(2)(A) (stating that an agency action may be overruled if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"); *see also M.B.*, 301 F.3d at 113 (citing *INS v. Yang*, 519 U.S. 26, 32, 117 S.Ct. 350, 136 L.Ed.2d 288 (1996)). Although a reviewing court must "engage in a substantial inquiry" of the administrative record before the agency, "the ultimate standard of review is a narrow one" where the reviewing court "is not empowered to substitute its judgment for that of the agency." *C.K. v. New Jersey Dep't of Health & Human Serv.*, 92 F.3d 171, 181–82 (3d Cir.1996) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)) (internal citations omitted). The terms of the enabling statute establish the scope of agency authority and the factors to consider. *C.K.*, 92 F.3d at 182. Where the statute is not informative, it is long-standing practice that the reviewing court must turn to legislative history. *Director v. Sun Ship, Inc.*, 150 F.3d 288, 291 (3d Cir.1998) (citing *Adams Fruit Co., Inc. v. Barrett*, 494 U.S. 638, 642, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990)). Operating within this framework, the reviewing court may set aside the agency decision only if there is "clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (distinguished on other grounds). Thus, even if there are genuine issues of material fact, deference must be given to the agency's interpretation of the facts, so long as they are based upon credible information.

### III. Discussion

### A. Background

The SIJ provisions of the INA were enacted in 1990 to protect abused, neglected, or abandoned children who, with their families, illegally entered the United States. Congress provided an alternative to deportation for these children. Rather than being deported along with abusive or neglectful parents, or deported to parents who had abandoned them once in the United States, such children may seek special status to remain in the United States. This rule was abused, however, by juveniles entering the United States as visiting students. *See, e.g.,* J.A. at 48, *Attorney General Reviewing Potential Abuse of Immigration Law: Hearings on the FY '98 Budget Request of the Justice Department Before the Appropriations Subcommittee on Commerce, Justice, State and the Judiciary of the Senate Appropriations Comm.,* 105th Cong. (1997) (Statement of Domenici, U.S. Senator) ("[T]his is a giant loophole … every visiting student from overseas can have a petition filed in a state court … declaring that they're a ward and in need of foster care, … [and] they're granting them."). The 1997 amendments at issue in this case, and discussed below, were enacted to address this problem. An appreciation of the legislative evolution of the SIJ provisions is vital to understanding the context of the present case.

SIJ status is conferred under 8 U.S.C. § 1101(a)(27)(J). In order for a child to be eligible for such status, an immigration court must declare the child dependent and eligible for long-term foster care as a result of abuse, abandonment, or neglect. § 1101(a)(27)(J)(I). The child also must be

under 21 years of age and unmarried. 8 C.F.R. § 204.11(c)(1)-(2). Additionally, eligibility for long-term foster care requires a finding that it is not in the best interest of the child to return to his or her home country. 8 U.S.C. § 1101(a)(27)(J)(ii); 8 C.F.R. § 204.11(c)(6). Prior to the 1997 amendments, a state court was able to conduct SIJ proceedings for any child. In 1997, Congress amended the SIJ status provision to require the consent of the United States Attorney General to hold a SIJ proceeding. 8 U.S.C. § 1101(a)(27)(J)(iii)(I) ("[T]he Attorney General [must] specifically consent to such [juvenile court] jurisdiction."). The INS District Director is empowered to make this determination on behalf of the Attorney General.[3]

■ The standard for making the consent determination is not articulated in the SIJ statute or its implementing regulation

at 8 C.F.R. § 204.11. For this reason, courts must look to legislative intent.[4] According to the House Report accompanying the 1997 Amendments, the purpose of the amendments is to "limit the beneficiaries of this provision to those juveniles for whom it was created, namely abandoned, neglected, or abused children...." H.R. Rep. No. 105–405, at 130 (1997), *available at* 1997 WL 712946, at *1; *see also M.B.*, 301 F.3d at 114 (stating that the purpose of the amendments is to "curtail the granting of special immigrant juvenile status)." (construing H.R.Rep. No. 105–405, at 130 (1997)). SIJ status is supported if "neither the dependency order nor the administrative or judicial determination of the alien's best interest was sought primarily for the purpose of obtaining the status of an alien lawfully admitted for permanent residence, rather than for the purpose of obtaining relief from abuse or neglect." H.R. Rep. 105–405, at 130 (1997).[5]

---

**3.** We take judicial notice that several bills are pending in Congress that may alter the role of the INS in determining eligibility for SIJ proceedings by establishing the Office of Children's Services, which would review these claims directly. S.R. 2444, 107 Cong. (2001) (pending before the Senate Judiciary Committee as of May 2, 2002); H.R.1904, 107 Cong. (2001) (pending before the House Committee on Judiciary as of May 30, 2001); S.R. 121, 107 Cong. (2001) (pending before the Senate Judiciary Committee, Subcommittee on Immigration, which held hearings on Feb. 28, 2002).

**4.** As the District Court properly notes, the INS' September 27, 1999, "Clarification of Interim Field Guidance" should not be afforded *Chevron* deference, and we need not rule on the merits of the approach presented there, since it lacks statutory construction and is not the product of formal rule-making procedures. *Yeboah*, 223 F.Supp.2d at 653–54 (discussing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). The memo states that the District Director should consent to SIJ proceedings if: "(1) it appears that the juvenile would be eligible for SIJ status if a dependency order is issued, and (2)

in the judgment of the district director, the dependency proceeding would be in the best interests of the juvenile." J.A. at 347, Pl.'s Am. Compl., Ex. A, Special Immigrant Juveniles: Clarification of Interim Field Guidance, July 9, 1999, at 2.

**5.** There appears to be an issue as to whether the Attorney General should determine if SIJ status is sought "primarily for the purpose of obtaining the status of an alien lawfully admitted for permanent residence, rather than for the purpose of obtaining relief from abuse or neglect" prior to consenting to the dependency hearing or afterward. The INS in its brief in this appeal argues that the quoted language refers only to juvenile aliens, not in INS custody, who have already obtained a state court dependency order. In *M.B.*, however, we considered the import of the quoted language in determining that the INS did not act arbitrarily and capriciously in denying a hearing to an alien who would not have been able to meet the standards required for an SIJ application. *M.B.*, 301 F.3d at 114. We agree with the *M.B.* panel that it is not arbitrary or capricious to deny consent to a hearing that would be an exercise in futility. *Id.* Implicitly, therefore, when a District Director

For the reasons stated below, we find that the INS District Director did not act arbitrarily or capriciously or abuse his discretion in denying consent to Julian for a juvenile court dependency hearing.

## B. Scope of Discretion of the District Director

■■■■ In considering the arbitrary and capricious standard, generally, and as noted by the District Court, we recognize that much deference is afforded to the agency; "[a]n action will not be deemed arbitrary, capricious, or an abuse of discretion simply because one may happen to think it ill-considered, or to represent the less appealing alternative solution available.... Rather, we require that the agency's action be rationally related to the purposes to be served, and supported by the facts found in the record." *Yeboah,* 223 F.Supp.2d at 655 (citing *Hondros v. United States Civil Service Comm'n,* 720 F.2d 278, 295–296 (3d Cir.1983) (internal citations and quotations omitted)). The INS Director's discretion is bound only by due process considerations. As a juvenile alien, Julian has the right to have his request for a dependency hearing considered in accordance with INS policy. *Yeboah,* 223 F.Supp.2d at 655 (citing *Blazina v. Bouchard,* 286 F.2d 507, 511 (3d Cir. 1961)).

The INS denied consent on the ground of improper purpose, stating:

> Julian has failed to establish that he suffered abuse, abandonment, or neglect in Ghana. Thus, the Service has concluded that Julian is not seeking SIJ status for the purpose of obtaining relief from abuse, abandonment and neglect, but rather is seeking that status for the

purpose of obtaining permanent residence.

In dispute are three aspects of the District Director's analysis: (1) whether the District Director may consider the intentions of the juvenile alien's parents when a juvenile seeks SIJ status, (2) whether the District Director may weigh evidence of abuse and abandonment in making the determination whether to consent to the dependency hearing, and (3) if so, whether the District Director's conclusion here that there was no abuse or abandonment was irrational. Each is examined in turn.

Julian argues that the District Director may consider only the intentions of the juvenile alien and not those of his parents for a § 1101(a)(27)(J) determination. Thus, he contends that, while his father may have had an improper purpose in sending Julian to the United States, if Julian does not share this intent, he should be entitled to a SIJ hearing. It is undisputed that the language of § 1101(a)(27)(J) does not specify whose purpose is to be considered. Julian cites language from House Report 105–405, at 130, for the proposition that since the "beneficiaries of the provision ... [are] juveniles," only the juvenile's intent matters. Similarly, Julian argues that "common sense" dictates that the intentions of parents should not be imputed to children for purposes of a statute designed to protect children from parental abuse.

The issue, however, is not imputing intent, but rather, the relevance of parental intent to the juvenile alien's claim for asylum. Both of Julian's arguments embed the same *non sequitur;* it does not follow that, because the statute seeks to protect the rights of abandoned, neglected, and

decides to deny a dependency hearing, it is not arbitrary or capricious for him to have considered whether allowing that hearing would be an exercise in futility. In reaching

this conclusion, Judge Roth and Judge Greenberg differ from the views that Judge Ward would have expressed in his dissent, had he lived. See footnote 7, *infra.*

abused children, parental intent behind the migration of the juvenile alien is irrelevant. In support of his position, Julian cites the 1993 statement of then-INS Acting Director Chris Sale that states "a child in need of the care and protection of the juvenile court should not be precluded from obtaining special immigrant status because of the actions of an irresponsible parent or other adult." 58 Fed.Reg. 42,-843, *42,847 (1993) (codified at 8 C.F.R. pt. 204.11).[6] This statement, however, predates the 1997 amendments and fails to address the factors that brought them about and that the District Director might consider in determining if there is an improper purpose.

Certainly, the record supports a conclusion that Julian's father sent Julian to the United States in order for Julian to become a permanent resident. There is evidence that: (1) Julian's father placed him on the airplane, (2) after the Attorney General issued his first denial of consent to a dependency hearing, Julian's father recanted his statement that he wanted Julian to return to Ghana, and (3) Julian thought that he was going to visit an aunt in New York and that a woman, who identified herself as Julian's aunt, contacted the Ghanaian Embassy to express her concern that he had not arrived.

Moreover, in considering whose "intent" is relevant, the parent's or the child's, we should keep in mind the purpose of the 1997 amendments: to close loopholes in the SIJ process by denying SIJ status to juvenile aliens who seek it primarily to obtain permanent residence. When it is the parents who are attempting to manipulate the system in order to obtain permanent residence in the United States for young children, it is consistent with the purpose of the 1997 amendments to focus on the purpose of the parents. It is the

parents of such children whom we want to deter from future efforts to subvert the SIJ process; the children are innocent pawns.

Julian contends, however, that the decision on improper motive is based on the INS determination that he had not suffered abuse, abandonment, or neglect. He posits that a juvenile court is qualified to make such a determination but that the INS is not. He argues that the District Director may not consider whether or not there has been abuse and abandonment when determining whether the purpose in seeking SIJ status is an improper one. He urges that the District Director usurps the role of the state juvenile court by weighing such evidence.

There is a long-standing practice of allowing the District Director broad discretion in immigration matters. *See Jay v. Boyd,* 351 U.S. 345, 351–52, 76 S.Ct. 919, 100 L.Ed. 1242 (1956). Congress did not indicate that the 1997 Amendments alter the scope of this discretion. In fact, the amendments broaden the discretion of the District Director by mandating that he consent to every SIJ proceeding. The District Court was within its discretion to weigh the circumstances surrounding Julian's trip to the United States, including the various statements of Julian's father and "aunt," and the contacts and relationship between Julian and his father both before and after Julian's arrival here.

 In order to come to the determination to deny consent, it was certainly within the discretion of the INS to consider the evidence of Julian's relationship with his family and his physical and mental condition. In doing so, the District Director is not making a child welfare evaluation in order to determine dependency

---

**6.** The quoted statement does not appear in the codified version of the final rule.

status of the juvenile but, rather, is weighing conflicting evidence of abandonment versus deliberate design on the part of the father to create permanent residence status for Julian. Certainly, a credibility determination of conflicting evidence is an appropriate role for the District Director to make in exercise of his authority to consent or not to a dependency hearing.

There is sufficient evidence in the record to support the District Director's conclusion that Julian had suffered no abuse or abandonment by his father and that the father's decision to send Julian to the United States was with the purpose of obtaining permanent residence status for Julian.

■■■ For the above reasons, the factors cited by the District Director in his denial of consent were considered properly within his discretion. His conclusion, based on these factors and determinations, was neither arbitrary nor capricious.[7]

## IV. Conclusion

For the foregoing reasons, we will affirm the order of the District Court, granting the INS's and denying Julian's cross motions for Summary Judgement.

---

[7.] Before his death, Judge Ward had expressed his intent to dissent from Part IV of this opinion. The reasoning for his dissent was based on his interpretation of 8 U.S.C. § 1101(A)(27)(J), the statute that grants SIJ status, as being overarchingly protective in nature.

In Judge Ward's view, the text of the statute, its generally protective purpose, and its legislative history require that the juvenile court be granted jurisdiction to hold a dependency hearing when a child seeking SIJ status presents evidence of abuse, neglect, or abandonment. In other words, when there is evidence that the child in question may be one of the children whom the statute is meant to protect, the government must permit the juvenile court, which is a neutral expert in child welfare, to make a finding. This finding is then reviewed by the Attorney General, who retains the power to consent to or to reject a dependency order, if one has issued, and to grant or to deny SIJ status.

Because Julian Yeboah had presented evidence that substantiated his claims of abuse and abandonment, Judge Ward came to the conclusion that the District Director abused his discretion in denying Julian a dependency hearing in juvenile court.